# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROBERT LANGE, Derivatively on Behalf of Nominal Defendant JUPITERMEDIA CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> GILBERT F. BACH, CHRISTOPHER J. BAUDOUIN, CHRISTOPHER S. CARDELL, MICHAEL J. DAVIES, ALAN M. MECKLER, JOHN R. PATRICK, and WILLIAM A. SHUTZER, <br><br> Defendants, <br><br> and <br><br> JUPITERMEDIA CORPORATION, <br><br> Nominal Defendant. | No. 3:06cv1822(SRU) <br><br><br><br><br> November 13, 2006 <br><br><br><br><br><br> **JURY TRIAL DEMANDED** |

## VERIFIED DERIVATIVE COMPLAINT

Plaintiff Robert Lange, by the undersigned attorneys, submits this Verified Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE OF THE ACTION

1.     This is a shareholder's derivative action brought for the benefit of nominal defendant Jupitermedia Corporation ("Jupitermedia" or the "Company")[1] against certain members of its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, unjust enrichment, and other violations of law.

2.     On September 6, 2006, the United States Senate Committee on Finance held a hearing, "Executive Compensation: Backdating to the Future/Oversight of current issues regarding executive compensation including backdating of stock options; and tax treatment of executive compensation, retirement and benefits."

3.     At the Senate Finance Committee Hearing, the Senate Finance Committee Chairman, Senator Chuck Grassley, in his opening statement, stated: "[Options backdating] is behavior that, to put it bluntly, is disgusting and repulsive. It is behavior that ignores the concept of an 'honest day's work for an honest day's pay' and replaces it with a phrase that we hear all too often today, 'I'm going to get mine.' . . . [S]hareholders and rank-and-file employees were ripped off by senior executives who rigged stock option programs – through a process called 'back-dating' – to further enrich themselves. And as we have found far too often in corporate scandals of recent years, boards of directors were either asleep at the switch, or in some cases, willing accomplices themselves . . .."

4.     At the Senate Finance Committee Hearing, the Chairman of the Securities Exchange Commission, Christopher Cox, stated, "Rather obviously, this fact pattern [of backdating options] results in a violation of the SEC's disclosure rules, a violation of accounting

---

[1] These terms shall also incorporate by reference the Company's prior names of internet.com Corporation and INT Media Group, Inc.

rules, and also a violation of the tax laws." The Commissioner of the IRS Mark Everson agreed and further stated, "Picking a date on which the stock price was low in comparison with the current price gives the employee the largest potential for gain on the option and makes it possible for the employee to benefit from corporate performance that occurred before the option was granted."

5.    In his statement before the Senate Finance Committee, Deputy Attorney General Paul J. McNulty described the practice of stock option backdating "as a brazen abuse of corporate power to artificially inflate the salaries of corporate wrongdoers at the expense of shareholders," and said "For some of those companies that have now disclosed backdated grants, corporate reputations have been tarnished and shareholder value has diminished substantially . . .."

6.    On September 6, 2006, MarketWatch, in an article titled "SEC Probing more than 100 firms on options: Cox," quoted the Senate Banking Committee Chairman, Senator Richard Shelby, saying that the manipulation of options grant dates "appears to be a black-and-white example of securities fraud," and "Corporate officers and directors engaging in this practice are cheating the owners of the company and should be held accountable to the fullest extent possible."

7.    On July 22, 2006, *The San Francisco Chronicle* recounted SEC Chairman Christopher Cox's announcement in San Francisco on July 20, 2006 where he said, "[backdating in many cases] makes a hash of (companies') financial statements . . . [and is] poisonous [to efficient markets]. . . . It is securities fraud if you falsify books and records. It is securities fraud if you present financial statements to the SEC that do not comply with generally accepted accounting principles. There is no requirement that (the defendant) personally profit [to prove

that a crime occurred.]"

8.      On June 18, 2006, in an article titled, "Options Scandal Brewing in Corporate World," SEC Chairman Christopher Cox was quoted, saying "[Backdating options] isn't a question about 'Whoops, I may have (accidentally) crossed a line here' . . . It's a question of knowingly betting on a race that's already been run."

9.      On May 26, 2006, *Forbes*, in an article titled, "The Next Big Scandal," quoted Former Securities and Exchange Commission ("SEC") Chairman Harvey L. Pitt, saying "What's so terrible about backdating options grants?  For one thing, it likely renders a company's proxy materials false and misleading.  Proxies typically indicate that options are granted at fair market value.  But if the grant is backdated, the options value isn't fair – at least not from the vantage point of the company and its shareholders."

10.     As alleged in detail herein, in gross breach of their fiduciary duties as officers and/or directors of Jupitermedia, the Individual Defendants (as defined herein) colluded with one another to:

      a.      improperly backdate many grants of Jupitermedia stock options to several Jupitermedia executives, in violation of the Company's shareholder-approved stock option plans;

      b.      improperly record and account for the backdated stock options, in violation of Generally Accepted Accounting Principles ("GAAP");

      c.      improperly take tax deductions based on the backdated stock options, in violation of Section 162(m) of the Internal Revenue Code; and

      d.      produce and disseminate to Jupitermedia shareholders and the market false financial statements and other false SEC filings that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options.

11.     As a result of the Individual Defendants' egregious misconduct, Jupitermedia has

sustained millions of dollars in damages, and the recipients of the backdated stock options have garnered millions of dollars in unlawful profits.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

13.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district. One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

14.     Plaintiff Robert Lange is, and was at all relevant times, a shareholder of nominal defendant Jupitermedia.

15.     Nominal defendant Jupitermedia is a Delaware corporation with its principal executive offices located at 23 Old Kings Highway South, Darien, Connecticut 06820. According to its public filings, Jupitermedia is a leading global provider of images, original online information and research for information technology business and creative professionals.

### Option Recipient Defendants

16.     Defendant Christopher J. Baudouin ("Baudouin") has served as the Company's Chief Financial Officer since its inception in November 1998. Baudouin has also served as

5

Executive Vice President or Senior Vice President since March 2003. He resigned as Chief Financial Officer and Executive Vice President of the Company in October 2006 to be effective at the end of December 2006.

17.     Defendant Christopher S. Cardell ("Cardell) has served as the Company's President and Chief Operating Officer and as a director since November 1998. He is also serving as Interim Chief Financial Officer.

18.     Defendant Michael J. Davies ("Davies") has served as a director of Jupitermedia since November 1998 and as a member of the Compensation Committee of the Board (the "Compensation Committee") and the Audit Committee of the Board (the "Audit Committee") since 1999. Davies has also served as the Chairman of the Compensation Committee since February 2003.

19.     Defendant Alan M. Meckler ("Meckler") has served as the Company's Chairman of the Board and Chief Executive Officer since November 1998.

20.     Collectively, defendants Baudouin, Cardell, Davies and Meckler are referred to herein as the "Option Recipient Defendants."

## Director Defendants

21.     Defendant Gilbert F. Bach ("Bach") has served as a director of Jupitermedia since November 1998. Bach has also served on the Audit Committee and on the Compensation Committee since 1999.

22.     Defendant John R. Patrick ("Patrick") has served as director and as a member of the Compensation Committee since January 2003 and has also served as the Chairman of the Audit Committee since February 2003.

23.     Defendant William A. Shutzer ("Shutzer") has served as a director of

Jupitermedia since January 2000 and has also served on the Compensation Committee and the Audit Committee since January 2000.

24.     Collectively, Option Recipient Defendants Cardell, Davies and Meckler and defendants Bach, Patrick and Shutzer are referred to herein as the "Director Defendants." The following chart summarizes the positions held by certain Director Defendants during the relevant time period of 1999 to 2001:

| Defendant | Recipient of Backdated Option Grants | Member of the Compensation Committee during relevant period | Member of the Audit Committee during relevant period |
|---|---|---|---|
| Bach |  | x | x |
| Cardell | x |  |  |
| Davies | x | x | x |
| Meckler | x |  |  |
| Shutzer |  | x | x |

**Individual Defendants**

25.     Collectively, the Option Recipient Defendants and the Director Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

26.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of the Company and

its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

27. The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

28. To discharge their duties, the Individual Defendants as officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

a. exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

b. exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

c. exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company;

d. exercise good faith in ensuring that the Company's financial statements were prepared in accordance with GAAP; and

e.   refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

29.   All of the Individual Defendants were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information.  According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure. Among other things, the Individual Defendants were required to:

(1)   make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(2)   devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

(a)   transactions are executed in accordance with management's general or specific authorization; and

(b)   transactions are recorded as necessary to permit preparation of financial statements in conformity with [GAAP].

30.   Jupitermedia's Audit Committee Charter provides that the Audit Committee shall, among other things,

a.   assist the Board of Directors in fulfilling its oversight responsibilities by:

- overseeing the integrity of the Company's financial statements;

- overseeing the independent auditor's qualifications and independence;

- overseeing the performance of the Company's independent auditor and internal audit function; and

- overseeing the Company's systems of disclosure controls

and procedures, internal controls over financial reporting, and compliance with ethical standards adopted by the Company.

b. review and discuss with management and the independent auditor the Company's annual financial statements, quarterly financial statements (prior to the Company's Form 10-Q filings or release of earnings), and all internal controls reports (or summaries thereof), and review other relevant reports or financial information submitted by the Company to any governmental body or the public, including management certifications as required by the Sarbanes-Oxley Act of 2002 and any relevant reports rendered by the independent auditor (or summaries thereof). The Chairman of the Audit Committee may represent the entire Audit Committee for purposes of the review of Form 10-Q prior to its filing or prior to the release of earnings.

c. recommend to the Board of Directors that the audited financial statements should be included in the annual report on Form 10-K.

d. review the independent auditor's attestation and report on management's internal control report, from the time that such reports are prepared and hold timely discussions with the independent auditor regarding the following:

- all critical accounting policies and practices;

- all alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor; and

- other material written communications between the independent auditor and management, including, but not limited to, the management letter and schedule of unadjusted differences.

## FACTUAL ALLEGATIONS

## Backdating of Stock Options Grants to the Option Recipient Defendants

31. According to Jupitermedia's proxy statements, at all times relevant hereto the Compensation Committee "review[ed] and approve[d] the compensation and benefits for the

Company's key executive officers, administer[ed] the Company's employee benefit plans and [made] recommendations to the Board regarding such matters."

32.     From 1999 to 2001, the Compensation Committee backdated the following stock option grants to the Option Recipient Defendants:

| Date of Purported Grant | Name | Exercise Price[2] | Number of Options |
|---|---|---|---|
| 06/25/99 | Meckler | $15.40 | 200,000 |
| | Cardell | $14.00 | 50,000 |
| | Baudouin | $14.00 | 15,000 |
| 09/07/99 | Meckler | $14.75 | 100,000 |
| | Cardell | $13.41 | 25,000 |
| | Baudouin | $13.41 | 5,000 |
| 04/17/00 | Meckler | $14.85 | 300,000 |
| | Cardell | $13.50 | 75,000 |
| | Baudouin | $13.50 | 25,000 |
| 12/07/00 | Meckler | $7.05 | 200,000 |
| | Cardell | $6.41 | 110,000 |
| | Baudouin | $6.41 | 27,500 |
| 05/24/01 | Meckler | $2.85 | 165,000 |
| | Cardell | $2.85 | 55,000 |
| | Baudouin | $2.85 | 13,750 |
| | Davies[3] | $2.85 | At least 1,000 |
| 09/24/01 | Meckler | $0.97 | 205,000 |
| | Cardell | $0.97 | 68,750 |
| | Baudouin | $0.97 | 17,000 |

33.     Pursuant to the terms of the Company's shareholder-approved stock option plans, including the 1999 Stock Incentive Plan, the exercise price of options granted to 10% stockholders "shall be at least 110% of the Fair Market Value (on the Date of Grant) of the Stock

---

[2] The exercise prices of the stock options granted to Meckler from 1999 to 2000 were equal to 110% of the fair market value of the Company's stock on the purported date of grant because Meckler owned at least 10% of the Company's stock during that time period.

[3] The May 24, 2001 grant to Davies did not appear in any proxy statements filed by the Company but was first disclosed in a Form 4 filed on November 22, 2004, which only included the number of options that were exercised

subject to the Option," and the exercise price of all other options must be no less than "the Fair Market Value of a share of Stock at the Date of Grant," where fair market value is defined as "the closing price on the primary exchange with which the Stock is listed and traded on the date prior to such date."

34.     Pursuant to Accounting Principles Board Opinion 25 ("APB 25"), the applicable GAAP provision at the time of the foregoing stock option grants, if the market price on the date of grant exceeds the exercise price of the options, the company must recognize the difference as an expense.

35.     Pursuant to Section 162(m) of the Internal Revenue Code, 26 U.S.C. § 162(m) ("Section 162(m)"), compensation in excess of $1 million per year, including gains on stock options, paid to a corporation's five most highly-compensated officers is tax deductible only if: (i) the compensation is payable solely on account of the attainment of one or more performance goals; (ii) the performance goals are determined by a compensation committee comprised solely of two or more outside directors, (iii) the material terms under which the compensation is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before the payment of the compensation, and (iv) before any payment of such compensation, the compensation committee certifies that the performance goals and any other material terms were in fact satisfied.

36.     In a striking pattern that could not have been the result of chance, all except one of the foregoing stock option grants were dated just after a sharp drop and just before a substantial rise in Jupitermedia's stock price, as demonstrated in the following chart:

---

and left unexercised on the transaction date, so the total number of options granted to Davies is unknown.

a.    Summary of Option Grants and Surrounding Stock Price Performance

| Purported Grant Date | Exercise Price | Stock Price 15 Trading Days Before Purported Grant Date | Stock Price 15 Trading Days After Purported Grant Date | % Rise After Purported Grant Date |
|---|---|---|---|---|
| 06/25/99 | $14.00 | n/a[4] | $25.50 | 82.14% |
|  | $15.40 |  |  |  |
| 09/07/99 | $13.41 | $11.50 | $15.75 | 17.45% |
|  | $14.75 |  |  |  |
| 04/17/00 | $13.50 | $48.00 | $16.75 | 24.07% |
|  | $14.85 |  |  |  |
| 12/07/00[5] | $6.41 | $17.13 | $5.94 | -7.37% |
|  | $7.05 |  |  |  |
| 05/24/01 | $2.85 | $3.80 | $3.75 | 31.58% |
| 09/24/01 | $0.97 | $3.00 | $1.38 | 42.27% |

b.    Stock Price Performance Surrounding Options Grant Purportedly Dated 06/25/99



6/25/99: Options granted at $14.00 and $15.40

---

[4] Jupitermedia was not publicly traded before June 25, 1999, so there are no historical prices before that date.
[5] Although there is no immediate rise following the option purportedly granted on December 7, 2000, it was backdated to one of the lowest prices of the entire year, as demonstrated herein.

c.    Stock Price Performance Surrounding Options Grant Purportedly Dated 09/07/99



09/07/99: Options granted at $13.41 and $14.75

d.    Stock Price Performance Surrounding Options Grant Purportedly Dated 04/17/00



04/17/00: Options granted at $13.50 and $14.85

14

e.    Stock Price Performance Surrounding Options Grant Purportedly Dated
      05/24/01



f.    Stock Price Performance Surrounding Options Grant Purportedly Dated
      09/24/01



37.    The reason for the extraordinary pattern set forth in the preceding paragraph is
that the purported grant dates set forth therein were not the actual dates on which the stock option
grants were made.   Rather, at the behest of the Option Recipient Defendants, the Director
Defendants improperly backdated the stock option grants to make it appear as though the grants
were made on dates when the market price of Jupitermedia stock was lower than the market price
on the actual grant dates.  This improper backdating, which violated the terms of the Company's

stock option plans, resulted in option grants with lower exercise prices, which improperly increased the value of the options to the Option Recipient Defendants and improperly reduced the amounts they had to pay the Company upon exercise of the options.

38.     According to a statistical analysis conducted by Plaintiff, there is a 98.25% likelihood that the fortuitous pattern of option grants alleged herein was not the result of random chance.  Indeed, the only explanation that is consistent with the observed pattern is that the options were backdated to coincide with favorable dates when the price of Jupitermedia stock was particularly low.

39.     The Individual Defendants' backdating of stock options was particularly egregious in fiscal years 1999, 2000, and 2001 when they backdated options to coincide with some of Jupitermedia's lowest closing prices of those respective years, as demonstrated in the following charts:

a.     Closing Stock Prices of 1999



b.     Closing Stock Prices of 2000



c.     Closing Stock Prices of 2001



## The Individual Defendants' Dissemination of False Financial Statements

40.     As a result of the improper backdating of stock options, the Company, with the knowledge, approval, and participation of each of the Individual Defendants,

    a.     violated the terms of the Company's shareholder-approved stock option plans by granting stock options with exercise prices less than the fair market value of the stock on the actual date of grant;

    b.     violated APB 25 by failing to recognize compensation expenses incurred when the improperly backdated options were granted;

    c.    violated Section 162(m) by taking tax deductions based on stock option grants that were not payable solely on account of the attainment of one or more performance goals and violated the terms of the Company's shareholder-approved stock option plans; and

    d.    produced and disseminated to Jupitermedia shareholders and the market false financial statements and other false SEC filings hat improperly recorded and accounted for the backdated option grants, and thereby understated compensation expenses and overstated net income.

41.    The Company, with the knowledge, approval, and participation of each of the Individual Defendants, disseminated its false financial statements in, *inter alia*, the following Form 10-K filings:

    a.    Form 10-K405 for the fiscal year ended December 31, 1999, filed with the SEC on March 10, 2000 and signed by defendants Meckler, Cardell, Baudouin, Bach, Davies, and Shutzer;

    b.    Form 10-K for the fiscal year ended December 31, 2000, filed with the SEC on April 2, 2001 and signed by defendants Meckler, Cardell, Baudouin, Bach, Davies, and Shutzer;

    c.    Form 10-K for the fiscal year ended December 31, 2001, filed with the SEC on March 29, 2002 and signed by defendants Meckler, Cardell, Baudouin, Bach, Davies, and Shutzer;

    d.    Form 10-K for the fiscal year ended December 31, 2002, filed with the SEC on March 28, 2003 and signed by defendants Meckler, Cardell, Baudouin, Bach, Davies, Shutzer, and Patrick;

    e.    Form 10-K for the fiscal year ended December 31, 2003, filed with the SEC on March 5, 2004 and signed by defendants Meckler, Cardell, Baudouin, Bach, Davies, Shutzer, and Patrick;

    f.    Form 10-K for the fiscal year ended December 31, 2004, filed with the SEC on March 16, 2005 and signed by defendants Meckler, Cardell, Baudouin, Bach, Davies, Shutzer, and Patrick; and

    g.    Form 10-K for the fiscal year ended December 31, 2005, filed with the SEC on March 16, 2006 and signed by defendants Meckler, Cardell, Baudouin, Bach, Davies, Shutzer, and Patrick.

42.    Furthermore, in each of its Form 10-K Annual Reports filed with the SEC for

fiscal years 1999 through 2005, the Company, with the knowledge, approval, and participation of each of the Defendants, falsely represented that it followed APB 25 to account for stock-based compensation:

> **Stock based compensation.** Jupitermedia grants to certain employees stock options with an exercise price equal to the fair value of the shares at the date of grant. Jupitermedia accounts for stock option grants in accordance with Accounting Principles Board ("APB") Opinion 25, "Accounting for Stock Issued to Employees", and accordingly, recognizes no compensation expense for such grants. As permitted under the provisions of SFAS No. 123, "Accounting for Stock-Based Compensation", Jupitermedia has not changed its method of accounting for stock-based compensation; however, SFAS No. 123, as amended by SFAS No. 148, requires footnote disclosures relating to the effect of using a fair value based method of accounting for stock-based compensation cost.

43.     Defendants Baudouin and Meckler filed false Certifications of Chief Executive Officer and Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (the "Certification"), certifying that each Annual Report of Jupitermedia on Form 10-Ks "fully complies with the requirements of section 13(a) and 15(d) of the Securities Exchange Act of 1934; and the information contained in the Report fairly presents, in all material respects, the financial conduction and results of operations of the Company." Defendants Baudouin and Meckler signed the following certifications:

a.     for the Form 10-K for the fiscal year ended December 31, 2002, filed with the SEC on March 28, 2003;

b.     for the Form 10-K for the fiscal year ended December 31, 2003, filed with the SEC on March 5, 2004;

c.     for the Form 10-K for the fiscal year ended December 31, 2004, filed with the SEC on March 16, 2005; and

d.     for the Form 10-K for the fiscal year ended December 31, 2005, filed with the SEC on March 16, 2006.

## The Individual Defendants' Concealment of Their Misconduct

44.     From 2000 to 2002, the Company, with the knowledge, approval, and participation of each of the Individual Defendants, for the purpose and with the effect of concealing the improper option backdating, disseminated to shareholders and filed with the SEC annual proxy statements that falsely reported the dates of stock option grants to the Option Recipient Defendants and falsely stated that the exercise price of the options granted to the Option Recipient Defendants were "equal to the fair market value of the Company's Common Stock on the date of grant," as follows:

      a.     Jupitermedia's proxy statement filed with the SEC on April 11, 2000 falsely reported that options granted to Meckler, Cardell, and Baudouin were granted on June 25, 1999 and September 7, 1999;

      b.     Jupitermedia's proxy statement filed with the SEC on April 30, 2001 falsely reported that options granted to Meckler, Cardell, and Baudouin were granted on April 17, 2000 and December 7, 2000; and

      c.     Jupitermedia's proxy statement filed with the SEC on April 11, 2002 falsely reported that options granted to Meckler, Cardell, and Baudouin were granted on May 24, 2001 and September 24, 2001.

45.     Moreover, the Reports of the Compensation Committee disclosed in the Company's proxy statements filed between 1999 and 2001 falsely stated that stock option grants are intended to "provide executives with the promise of longer term rewards which appreciate in value with the favorable future performance of the Company," and to "align senior management's objectives with long-term stock price appreciation."

46.     From 2004 to 2005, the Company, with the knowledge, approval, and participation of each of the Individual Defendants, for the purpose and with the effect of concealing the improper option backdating, filed with the SEC Form 4's that falsely reported the dates of stock option grants to the Option Recipient Defendants, as follows:

a. Meckler's Form 4 filed with the SEC on May 28, 2004 falsely reported that options granted to Meckler had been granted on May 24, 2001 and September 24, 2001;

b. Baudouin's Form 4 filed with the SEC on May 28, 2004 falsely reported that options granted to Baudouin had been granted on May 24, 2001;

c. Cardell's Form 4 filed with the SEC on May 28, 2004 falsely reported that options granted to Cardell had been granted on May 24, 2001;

d. Baudouin's Form 4 filed with the SEC on May 28, 2004 falsely reported that options granted to Baudouin had been granted on September 24, 2001;

e. Cardell's Form 4 filed with the SEC on May 28, 2004 falsely reported that options granted to Cardell had been granted on September 24, 2001;

f. Meckler's Form 4 filed with the SEC on August 27, 2004 falsely reported that options granted to Meckler had been granted on May 24, 2001;

g. Cardell's Form 4 filed with the SEC on August 27, 2004 falsely reported that options granted to Cardell had been granted on May 24, 2001;

h. Baudouin's Form 4 filed with the SEC on November 22, 2004 falsely reported that options granted to Baudouin had been granted on May 24, 2001 and September 24, 2001;

i. Davies' Form 4 filed with the SEC on November 22, 2004 falsely reported that options granted to Davies had been granted on May 24, 2001;

j. Meckler's Form 4 filed with the SEC on April 05, 2005 falsely reported that options granted to Meckler had been granted on April 17, 2000;

k. Meckler's Form 4 filed with the SEC on April 07, 2005 falsely reported that options granted to Meckler had been granted on April 17, 2000;

l. Meckler's Form 4 filed with the SEC on April 13, 2005 falsely reported that options granted to Meckler had been granted on April 17, 2000;

m. Meckler's Form 4 filed with the SEC on April 14, 2005 falsely reported that options granted to Meckler had been granted on April 17, 2000;

n. Meckler's Form 4 filed with the SEC on April 14, 2005 falsely reported that options granted to Meckler had been granted on April 17, 2000;

o. Meckler's Form 4 filed with the SEC on May 11, 2005 falsely reported that options granted to Meckler had been granted on December 07, 2000; and

p.  Meckler's Form 4 filed with the SEC on May 11, 2005 falsely reported that options granted to Meckler had been granted on September 24, 2001.

47.  The Individual Defendants have continued to conceal their foregoing misconduct. It has only been brought to light as a result of this Complaint filed against them for backdating Jupitermedia stock option grants to the Option Recipient Defendants.

## The Individual Defendants' Insider Selling

48.  During the relevant period, certain of the Individual Defendants, while in possession of materially adverse non-public information regarding the backdating of stock options and the false financial statements resulting therefrom, sold more than $45 million in Jupitermedia stock, a significant portion of which was obtained through the exercise of improperly backdated stock options.

49.  According to Form 4's filed with the SEC between 2004 and 2006, defendant Baudouin received approximately $2,281,898.90 in proceeds by selling Jupitermedia stock. During that same period, defendant Cardell received approximately $2,579,000.00 in sale proceeds. Defendant Davies sold more than 28,000 shares in one day, receiving a total of $522,102.92. Defendant Meckler, from 2003 to 2006, sold approximately 3,146,834 shares of Jupitermedia stock and received $40,114,966.99 in proceeds. Moreover, Defendant Shutzer obtained at least $415,000.00 in proceeds by selling Company stock in 2004.

## THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

50.  In a misguided effort to attract and retain employees in a competitive environment, the Individual Defendants exceeded the bounds of the law and legitimate business judgment by perpetrating their backdating scheme. The Individual Defendants' misconduct was unjustifiable and constituted a gross breach of their fiduciary duties by:

a.   colluding with each other to backdate stock option grants;

b.   colluding with each other to violate GAAP and Section 162(m);

c.   colluding with each other to produce and disseminate to Jupitermedia shareholders and the market false financial statements and other false SEC filings that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

d.   colluding with each other to file false proxy statements, false financial statements, and false Form 4s in order to conceal the improper backdating of stock options.

51.   The Individual Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit the Option Recipient Defendants at the expense of the Company.

52.   As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company will be required to incur and loss of funds paid to the Company upon exercise of options.

53.   As alleged herein, the Option Recipient Defendants have exercised hundreds of thousands of backdated options at improperly low prices and have then sold the shares for hundreds of millions in proceeds. Consequently, the Option Recipient Defendants have been unjustly enriched by garnering millions of dollars in illicit profits and depriving the Company of millions of dollars in payments that the Company should have received upon exercise of the options.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

54.   Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress Individual Defendants' breaches of fiduciary duties, unjust enrichment, and

other violations of law.

55.     Plaintiff is an owner of Jupitermedia common stock and was an owner of Jupitermedia common stock at all times relevant hereto.

56.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

57.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Jupitermedia Board of Directors to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

58.     The Board currently consists of six directors: defendants Bach, Cardell, Davies, Meckler, Patrick, and Shutzer. The following directors are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action:

      a.    Bach, because as a member of the Compensation Committee, he directly participated in and approved the improper backdating of stock options, as alleged herein, and as a member of the Audit Committee, he directly participated in and knowingly approved the filing of false financial statements and other false SEC filings as alleged herein and directly participated in and approved the Company's violations of GAAP and Section 162(m), as alleged herein. Therefore, Bach is substantially likely to be held liable for the misconduct complained of herein. Moreover, by colluding with the Option Recipient Defendants and others, as alleged herein, Bach has demonstrated that he is unable or unwilling to act independently of the Option Recipient Defendants;

      b.    Cardell, because as an Option Recipient Defendant, he is directly interested in the improperly backdated stock option grants complained of herein. As a director of the Company Cardell directly participated in and approved the Company's filing of and signed false financial statements and other false SEC filings, as alleged herein. Moreover, by colluding with the other Option Recipient Defendants and others, as alleged herein, Cardell has demonstrated that he is unable or unwilling to act independently of the Option Recipient Defendants. Also, his principal professional occupation is his position as President and Chief Operating

Officer of the Company. In his position as President and Chief Operating Officer of the Company, Cardell stands to earn hundreds of thousands of dollars in annual salary, bonuses, and other compensation, all of which must be approved by defendants Bach, Davies, Patrick, and Shutzer, who currently serve as members of the Compensation Committee. Accordingly, Cardell is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against the Individual Defendants;

c.   Davies, because as an Option Recipient Defendant, he is directly interested in the improperly backdated stock option grants complained of herein. Also, as a member of the Compensation Committee, he directly participated in and approved the improper backdating of stock options, as alleged herein, and as a member of the Audit Committee, he directly participated in and knowingly approved the filing of false financial statements and other false SEC filings as alleged herein and directly participated in and approved the Company's violations of GAAP and Section 162(m), as alleged herein. Therefore, Davies is substantially likely to be held liable for the misconduct complained of herein. Moreover, by colluding with the other Option Recipient Defendants and others, as alleged herein, Davies has demonstrated that he is unable or unwilling to act independently of the Option Recipient Defendants;

d.   Meckler, because as an Option Recipient Defendant, he is directly interested in the improperly backdated stock option grants complained of herein. As a director of the Company Meckler directly participated in and approved the Company's filing of and signed false financial statements and other false SEC filings, as alleged herein. Moreover, by colluding with the other Option Recipient Defendants and others, as alleged herein, Meckler has demonstrated that he is unable or unwilling to act independently of the Option Recipient Defendants. Also, his principal professional occupation is his position as Chief Executive Officer of the Company. In his position as Chief Executive Officer of the Company, Meckler stands to earn hundreds of thousands of dollars in annual salary, bonuses, and other compensation, all of which must be approved by defendants Bach, Davies, Patrick, and Shutzer, who currently serve as members of the Compensation Committee. Accordingly, Meckler is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against the Individual Defendants;

e.   Patrick, because as a director of the Company, he directly participated in and approved the Company's filing of and signed false financial statements and other false SEC filings, as alleged herein. Moreover, by colluding with the Option Recipient Defendants and others, as alleged herein, Patrick has demonstrated that he is unable or unwilling to act

independently of the Option Recipient Defendants; and

f.    Shutzer, because as a member of the Compensation Committee, he directly participated in and approved the improper backdating of stock options, as alleged herein, and as a member of the Audit Committee, he directly participated in and knowingly approved the filing of false financial statements and other false SEC filings as alleged herein and directly participated in and approved the Company's violations of GAAP and Section 162(m), as alleged herein. Therefore, Shutzer is substantially likely to be held liable for the misconduct complained of herein. Moreover, by colluding with the Option Recipient Defendants and others, as alleged herein, Shutzer has demonstrated that he is unable or unwilling to act independently of the Option Recipient Defendants.

59.    Furthermore, demand is excused because the misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment. As represented in Jupitermedia's proxy statements, the stated purpose of the Company's shareholder-approved stock option plans is to retain and motivate employees by providing compensation that reflects the performance of the Company. However, by granting options with backdated exercise prices, the Individual Defendants undermined the purpose of the Company's shareholder-approved stock option plans by awarding employees compensation that had intrinsic value regardless of Jupitermedia's performance. In effect, this practice was nothing more than secret handouts to executives and employees at the expense of unsuspecting shareholders and the Company.

60.    The Individual Defendants could have achieved the stated purpose of retaining and motivating employees by granting them additional options under their incentive plans, or by granting options at a price less than the fair market value on the date of the grant and simply disclosing and expensing these grants. Instead, the Individual Defendants retained and motivated Jupitermedia employees by backdating option grants in violation of the Company's shareholder-approved stock option plans and improperly reporting these grants in their financial disclosures to improve their bottom line.

**COUNT I**
**Against the Individual Defendants for**
**Violations of § 10(b) and Rule 10b-5 of the Securities Exchange Act**

61.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

62.     Throughout the relevant period, the Individual Defendants individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, intentionally or recklessly employed devices, schemes, and artifices to defraud and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the Company.

63.     The Individual Defendants, as top executive officers and/or directors of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as officers and/or directors of the Company, each of the Individual Defendants was able to and did control the conduct complained of herein.

64.     The Individual Defendants acted with scienter in that they either had actual knowledge of the fraud set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were among the senior management and directors of the Company and were therefore directly responsible for the fraud alleged herein.

65.     The Company relied upon the Individual Defendants' fraud in granting the Option Recipient Defendants options to purchase shares of the Company's common stock, as alleged herein.

66.     As a direct and proximate result of the Individual Defendants' fraud, the Company has sustained damages, including, but not limited to, the additional compensation

expenses and tax liabilities the Company will be required to incur and loss of funds paid to the Company upon exercise of options.

## COUNT II
### Against the Individual Defendants for
### Violations of §14(a) of the Securities Exchange Act

67.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

68.     Rule 14-A-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14-A-9.

69.     The proxy statements described herein violated §14(a) and Rule 14-A-9 because they omitted material facts, including the fact that the Individual Defendants were causing the Company to engage in an option backdating scheme, a fact which the Individual Defendants were aware of and participated in from at least 1996 to 2002.

70.     In the exercise of reasonable care, the Individual Defendants should have known that the proxy statements were materially false and misleading.

71.     The misrepresentation and omissions in the proxy statements were material. The proxy statements were an essential link in the accomplishment of the continuation of the Individual Defendants' unlawful stock option backdating scheme, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation, and the Company's compensation policies.

72.     The Company was damaged as a result of the material misrepresentations and omissions in the proxy statements.

## COUNT III
### Against Baudouin, Meckler and the Director Defendants for
### Violations of §20(a) of the Securities Exchange Act

73.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

74.     Baudouin, Meckler and the Director Defendants, by virtue of their positions with the Company and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of the Company within the meaning of §20(a) of the Exchange Act.  They had the power and influence and exercised the same to cause the Company to engage in the illegal conduct and practices complained of herein.

## COUNT IV
### Against the Individual Defendants for
### Accounting

75.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

76.     As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to, among other things, refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

77.     As alleged in detail herein, the Individual Defendants breached their fiduciary duties by, among other things, engaging in a scheme to grant backdated stock options to themselves and/or certain other officers and directors of the Company and cover up their misconduct.

78.     The Individual Defendants possess complete and unfettered control over the improperly issued stock option grants and the books and records of the Company concerning the details of such improperly backdated stock option grants.

79.     As a result of the Individual Defendants' misconduct, the Company has been damaged financially and is entitled to a recovery as a result thereof.

80.     Plaintiff demands an accounting be made of all stock option grants made to any of the Option Recipient Defendants, including, but not limited to, the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the grants, the dates the options were exercised, as well as the disposition of any proceeds received by any of the Option Recipient Defendants via sale or other exercise of the grants.

## COUNT V
### Against the Individual Defendants for
### Breach of Fiduciary Duty and/or Aiding and Abetting

81.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

82.     As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to, among other things, refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

83.     As alleged in detail herein, the Individual Defendants breached their fiduciary duties by, among other things, engaging in a scheme to grant backdated stock options to themselves and/or certain other officers and directors of the Company and cover up their misconduct.

84.     In breach of their fiduciary duties of loyalty and good faith, the Individual Defendants agreed to and did participate with and/or aided and abetted one another in a

deliberate course of action designed to divert corporate assets to themselves and/or other Company insiders.

85.     The Individual Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit the Option Recipient Defendants at the expense of the Company.

86.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, the Company has sustained damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company will be required to incur and loss of funds paid to the Company upon exercise of options.

## COUNT VI
### Against the Option Recipient Defendants for
### Unjust Enrichment

87.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

88.     The Option Recipient Defendants were unjustly enriched by their receipt and retention of backdated stock option grants and the proceeds they received through exercising backdated stock options, as alleged herein, and it would be unconscionable to allow them to retain the benefits thereof.

89.     To remedy the Option Recipient Defendants' unjust enrichment, the Court should order them to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized.

## COUNT VII
### Against the Option Recipient Defendants for
### Rescission

90.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

91.     As a result of the acts alleged herein, the stock option contracts between Option Recipient Defendants and the Company entered into during the relevant period were obtained through the Individual Defendants' fraud, deceit, and abuse of control.  Further, the backdated stock options were illegal grants and thus invalid as they were not authorized in accordance with the terms of the Company's shareholder-approved stock option plans.

92.     All contracts, which provide for stock option grants to the Option Recipient Defendants and were entered into during the relevant period should, therefore, be rescinded, with all sums paid under such contracts returned to the Company, and all such executory contracts cancelled and declared void.

WHEREFORE, Plaintiff demands judgment as follows:

A.     Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.     Ordering the Option Recipient Defendants to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized;

C.     Granting appropriate equitable relief to remedy Defendants' breaches of fiduciary duties;

D.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.


Dated: November  13, 2006

THE PLAINTIFF,

Michael H. Rudy
Attorney at Law (Juris #421508)
87 Rising Ridge
Ridgefield, CT 06877
Telephone: (203) 431-2269

SCHIFFRIN & BARROWAY, LLP
Eric L. Zagar
Michael Hynes
Tara P. Kao
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706

*Attorneys for Plaintiff*

## JUPITERMEDIA CORPORATION VERIFICATION

I, Robert Lange, hereby verify that I am familiar with the allegations in the Complaint, and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information and belief.

DATE: _10/27/2006_                    _Robert A. Lange_
                                      SIGNATURE