## UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROBERT LANGE, Derivatively on Behalf of Nominal Defendant JUPITERMEDIA CORPORATION, | Civil Action No. 3:06 CV 1822 (SRU) |
| Plaintiff, | |
| v. | |
| GILBERT F. BACH. CHRISTOPHER J. BAUDOUIN, CHRISTOPHER S. CARDELL, MICHAEL J. DAVIES, ALAN M. MECKLER and WILLIAM A. SHUTZER, | |
| Defendants, | |
| and | July 16, 2006 |
| JUPITERMEDIA CORPORATION, | |
| Nominal Defendant. | |

## AMENDED VERIFIED DERIVATIVE COMPLAINT

Plaintiff Robert Lange, having obtained the written consent of the defendants to file this amended complaint, by the undersigned attorneys, submits this Amended Verified Derivative Complaint (the "Amended Complaint") against the defendants named herein.

## NATURE OF THE ACTION

1.      This is a shareholder's derivative action brought for the benefit of nominal defendant Jupitermedia Corporation ("Jupitermedia" or the "Company")[1] against certain members of its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, unjust enrichment, and other violations of law.

2.      For several years, a majority of Jupitermedia directors, together with its top officers, engaged in a secret scheme to grant undisclosed, in-the-money stock options[2] to themselves and others by backdating stock option grants to coincide with historically low closing prices of Jupitermedia common stock.  In fact, in a striking pattern, in every year of the relevant period, the Individual Defendants (defined herein) consistently selected grant dates at or near the yearly lows of Jupitermedia stock.  Moreover, 6 out of 7 stock option grants made since its initial public offering through September 2001 were backdated, all of which were granted to Jupitermedia's top highly compensated executives whose grants are disclosed in the Company's proxy statements.

3.      The Individual Defendants knowingly and deliberately engaged in a practice of backdating stock option grants to the Option Recipient Defendants (defined herein) in a manner designed to create immediate and risk-free rewards for such recipients in direct contravention of the Company's shareholder-approved stock option plans and disclosures in Securities and Exchange Commission ("SEC") filings.  By falsifying the date on which options were granted,

---

[1] These terms shall also incorporate by reference the Company's prior names of internet.com Corporation and INT Media Group, Inc.

[2] A stock option is a contract that gives the holder the option to purchase a designated quantity of shares of a company's stock at a set price called the exercise or strike price.  When the option is exercised, the holder acquires a restricted number of shares at the stated price, regardless of the stock's contemporaneous market price.  A stock option is "in-the-money" when the exercise price of an option is below the market price of the underlying stock on the date of grant.

the Individual Defendants caused the Company to materially understate Jupitermedia's expenses and overstate its net income. The Individual Defendants knew, or recklessly disregarded, that because the Company had not recognized a compensation expense for the backdated options, Jupitermedia's reported earnings and expenses were false and misleading and not in compliance with the Generally Accepted Accounting Principles ("GAAP").

4.      Jupitermedia has suffered, and will continue to suffer, significant financial and non-monetary damages and injuries, several of which were identified in a May 16, 2006 report issued by the Center for Financial Research and Analysis, entitled "Options Backdating – Which Companies Are at Risk?":

- Securities Exchange Commission ("SEC") investigation risk – The SEC has begun information investigations at many companies in recent months and has also begun to call for improved disclosures around all areas of executive compensation.

- Accounting restatement risk – Some companies which have admitted backdating options have accompanied those admissions with financial restatements impacting both the balance sheet and earnings.

- Tax/Cash implications – The change in options from the practice of options backdating may force some companies to restate tax positions for the years in question, which could result in an obligation to pay back taxes.

- Management credibility risk – If a reputable management team is found to have repeatedly backdated options, thereby enriching themselves at the expense of shareholder, the reputation of management (and the related stock premium for superior management) could take a hit.

5.      The Individual Defendants' backdating scheme, not only surreptitiously and illegally lined their own pockets and caused Jupitermedia to issue materially false financial statements, but undermined the key purpose of stock option-based executive compensation, *i.e.*, to provide incentive to improve the Company's performance and increase the Company's stock

3

price and market capitalization.  By manipulating options such that they carried a strike price lower than the trading price of the stock on the date of grant, Jupitermedia insiders profited immediately upon the award of the options without doing anything to improve the Company's business or financial condition – a situation which government officials found clearly improper and illegal.

6.      For instance, former SEC Chairman Harvey L. Pitt was quoted, saying "What's so terrible about backdating options grants?  For one thing, it likely renders a company's proxy materials false and misleading.  Proxies typically indicate that options are granted at fair market value.  But if the grant is backdated, the options value isn't fair – at least not from the vantage point of the company and its shareholders."  The Senate Banking Committee Chairman, Senator Richard Shelby, has also stated that manipulation of options grant dates "appears to be a black-and-white example of securities fraud."

7.      SEC Chairman Christopher Cox was quoted, saying "[Backdating options] isn't a question about 'Whoops, I may have (accidentally) crossed a line here' . . . It's a question of knowingly betting on a race that's already been run."   He has also announced that "[backdating in many cases] makes a hash of (companies') financial statements . . . [and is] poisonous [to efficient markets]. . . . It is securities fraud if you falsify books and records.  It is securities fraud if you present financial statements to the SEC that do not comply with generally accepted accounting principles.  There is no requirement that (the defendant) personally profit [to prove that a crime occurred.]"  He has further stated, "Rather obviously, this fact pattern [of backdating options] results in a violation of the SEC's disclosure rules, a violation of accounting rules, and also a violation of the tax laws."

8.    The Commissioner of the Internal Revenue Service ("IRS") Mark Everson agreed and has further stated, "Picking a date on which the stock price was low in comparison with the current price gives the employee the largest potential for gain on the option and makes it possible for the employee to benefit from corporate performance that occurred before the option was granted."

9.    In addition to the foregoing, a recent academic study revealed that outside directors of companies were also benefiting from backdating and were recipients of manipulated stock option grants, as detailed in the following *Wall Street Journal* article published on December 18, 2006:

> A new academic study suggests that many outside directors received manipulated stock-option grants, a finding that may help explain why the practice of options backdating wasn't stopped by the boards of some companies.
>
> The statistical study, which names no individuals or firms, estimates that 1,400 outside directors at 460 companies received questionable option grants, suggesting the widespread practice extended well beyond the executive suite.
>
> The study is notable because it suggests that outside, or independent, directors -- who are supposed to play a special role safeguarding against cozy board relationships with management -- may have been co-opted in options backdating by receiving manipulated grants themselves. The New York Stock Exchange requires that a majority of board seats, and all compensation- and audit-committee members, be independent . . . .
>
> The evidence "contributes to understanding the possible factors that led to or enabled manipulation to occur," states the unpublished study, which was conducted by professors at Harvard and Cornell universities and the French business school Insead . . . .

10.    As alleged in detail herein, in gross breach of their fiduciary duties as officers and/or directors of Jupitermedia, the Individual Defendants (as defined herein) colluded with one another to:

a.    improperly backdate many grants of Jupitermedia stock options to several Jupitermedia executives, in violation of the Company's

shareholder-approved stock option plans;

b.　improperly record and account for the backdated stock options, in violation of GAAP;

c.　improperly take tax deductions based on the backdated stock options, in violation of Section 162(m) of the Internal Revenue Code, 26 U.S.C. § 162(m) ("Section 162(m)"); and

d.　produce and disseminate to Jupitermedia shareholders and the market false financial statements and other false SEC filings that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options.

11.　As a result of the Individual Defendants' egregious misconduct, Jupitermedia has sustained substantial damages, and the recipients of the backdated stock options have garnered an enormous amount in unlawful profits.

## JURISDICTION AND VENUE

12.　This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Amended Complaint states a federal question.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

13.　Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

14.     Plaintiff Robert Lange is, and was at all relevant times, a shareholder of nominal defendant Jupitermedia.

15.     Nominal defendant Jupitermedia is a Delaware corporation with its principal executive offices located at 23 Old Kings Highway South, Darien, Connecticut 06820. According to its public filings, Jupitermedia is a leading global provider of images, original online information and research for information technology business and creative professionals.

### Option Recipient Defendants

16.     Defendant Christopher J. Baudouin ("Baudouin") served as the Company's Chief Financial Officer since its inception in November 1998 until his resignation in December 2006. Baudouin also served as Executive Vice President or Senior Vice President from March 2003 to December 2006.

17.     Defendant Christopher S. Cardell ("Cardell) has served as the Company's President and Chief Operating Officer and as a director since November 1998. He also recently served as Interim Chief Financial Officer.

18.     Defendant Michael J. Davies ("Davies") has served as a director of Jupitermedia since November 1998 and as a member of the Compensation Committee of the Board (the "Compensation Committee") and the Audit Committee of the Board (the "Audit Committee") since 1999. Davies has also served as the Chairman of the Compensation Committee since February 2003.

19.     Defendant Alan M. Meckler ("Meckler") has served as the Company's Chairman of the Board and Chief Executive Officer ("CEO") since November 1998.

20.     Collectively, defendants Baudouin, Cardell, Davies and Meckler are referred to

7

herein as the "Option Recipient Defendants."

## Director Defendants

21.     Defendant Gilbert F. Bach ("Bach") has served as a director of Jupitermedia since November 1998.  Bach has also served on the Audit Committee and on the Compensation Committee since 1999.

22.     Defendant William A. Shutzer ("Shutzer") has served as a director of Jupitermedia since January 2000 and has also served on the Compensation Committee and the Audit Committee since January 2000.

23.     Collectively, Option Recipient Defendants Cardell, Davies and Meckler and defendants Bach and Shutzer are referred to herein as the "Director Defendants."

## Individual Defendants

24.     Collectively, the Option Recipient Defendants and the Director Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

25.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the

affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

26.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

27.     To discharge their duties, the Individual Defendants as officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the Individual Defendants were required to, among other things:

  a.     exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

  b.     exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

  c.     exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company;

  d.     exercise good faith in ensuring that the Company's financial statements were prepared in accordance with GAAP; and

  e.     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

28.     All of the Individual Defendants were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the

Company's financial statements were based on accurate financial information. According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure. Among other things, the Individual Defendants were required to:

> (1)   make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and
>
> (2)   devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –
>
>> (a)   transactions are executed in accordance with management's general or specific authorization; and
>>
>> (b)   transactions are recorded as necessary to permit preparation of financial statements in conformity with [GAAP].

29.   Jupitermedia's Audit Committee Charter provides that the Audit Committee shall, among other things,

> a.   assist the Board of Directors in fulfilling its oversight responsibilities by:
>
> - overseeing the integrity of the Company's financial statements;
>
> - overseeing the independent auditor's qualifications and independence;
>
> - overseeing the performance of the Company's independent auditor and internal audit function; and
>
> - overseeing the Company's systems of disclosure controls and procedures, internal controls over financial reporting, and compliance with ethical standards adopted by the Company.
>
> b.   review and discuss with management and the independent auditor the Company's annual financial statements, quarterly financial statements (prior to the Company's Form 10-Q filings or release of earnings), and all internal controls reports (or summaries thereof),

and review other relevant reports or financial information submitted by the Company to any governmental body or the public, including management certifications as required by the Sarbanes-Oxley Act of 2002 and any relevant reports rendered by the independent auditor (or summaries thereof). The Chairman of the Audit Committee may represent the entire Audit Committee for purposes of the review of Form 10-Q prior to its filing or prior to the release of earnings.

c.    recommend to the Board of Directors that the audited financial statements should be included in the annual report on Form 10-K.

d.    review the independent auditor's attestation and report on management's internal control report, from the time that such reports are prepared and hold timely discussions with the independent auditor regarding the following:

- all critical accounting policies and practices;

- all alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor; and

- other material written communications between the independent auditor and management, including, but not limited to, the management letter and schedule of unadjusted differences.

30.    Jupitermedia's Compensation Committee Charter provides that the Compensation Committee shall, among other things,

a.    Take any and all action which may be taken by the Board of Directors with respect to fixing the compensation level of and recommending any employment, severance or similar agreements for executive officers and other senior executives of the Corporation, including but not limited to the development of compensation policies that will attract and retain the highest qualified executives, that will clearly articulate the relationship of corporate performance to executive compensation and that will reward executives for the Corporation's progress.

b.    Review and approve corporate goals and objectives relevant to the CEO's compensation, evaluate the CEO's performance in light of those goals and objectives and, either as a committee or together with other independent

11

directors of the Board of Directors (as directed by the Board of Directors), determine and approve the CEO's compensation based on this evaluation. In determining the long-term incentive compensation of the CEO, the Compensation Committee shall consider the Corporation's performance and relative shareholder return, the value of similar incentive awards given to chief executive officers at comparable companies and the compensation awards given to the Corporation's CEO in past years. The CEO may not be present during such voting and deliberation.

c.      Review and make recommendations to the full Board of Directors regarding the amount and types of compensation that should be paid to the Corporation's outside directors, to ensure that such pay levels remain competitive, taking into account such factors as the Corporation's size, industry characteristics, location, the practices at comparable companies in the same region, and such other factors as the Compensation Committee deems relevant.

d.      Propose the adoption, amendment, and termination of incentive-compensation plans and equity-based plans, such as stock option plans, stock appreciation rights plans, pension and profit sharing plans, stock bonus plans, stock purchase plans, bonus plans, deferred compensation plans and other similar programs (the "Compensation Plans"), and to oversee the administration of the Compensation Plans in accordance with their terms.

e.      Determine and approve the form and amount of awards to eligible Corporation executives in accordance with the terms of the applicable Compensation Plans . . . .

f.      Periodically report the matters considered and actions taken by the Compensation Committee to the Board of Directors or whenever the Compensation Committee shall be called to do so by the Board of Directors.

g.      Delegate its authority hereunder to subcommittees, as the Compensation Committee deems appropriate, so long as any actions taken by such subcommittees are not otherwise inconsistent with the obligations and responsibilities of the Compensation Committee.

h.      Monitor and ensure that independent directors continue to meet the applicable independence requirements of the SEC, the Internal Revenue Code and the Nasdaq National Market . . . .

i.      To do every other act incidental to, arising out of or in connection with, or otherwise related to, the authority granted to the Compensation Committee hereby or the carrying out of the Compensation Committee's duties and

responsibilities hereunder.

## FACTUAL ALLEGATIONS

### Overview of Jupitermedia Stock Option Grants

31.     According to Jupitermedia's proxy statements, at all times relevant hereto the Compensation Committee "review[ed] and approve[d] the compensation and benefits for the Company's key executive officers, administer[ed] the Company's employee benefit plans and [made] recommendations to the Board regarding such matters."

32.     In addition, the proxy statements claim "[t]he key components of executive officer compensation are base salary and stock options. The Compensation Committee attempts to combine these components in such a way as to attract, motivate and retain key executives critical to the long-term success of the Company" and also state "[t]he Company's Stock Incentive Plan is intended to provide executives with the promise of longer term rewards which appreciate in value with the favorable future performance of the Company. Stock options are generally granted when an executive joins the Company, with additional options granted from time to time for promotions and performance.  The Compensation Committee believes that the stock option participation provides a method of retention and motivation for the executives of the Company and also aligns senior management's objectives with long-term stock price appreciation."

33.     Pursuant to the terms of the Company's shareholder-approved stock option plan, the 1999 Stock Incentive Plan (the "Plan"), "[t]he exercise price ("Option Price") per share of Stock for each Option shall be set by the Committee at the time of grant but shall not be less than (i) in the case of an Incentive Stock Option, and subject to Section 7(e), the Fair Market Value of a share of Stock at the Date of Grant, and (ii) in the case of a Non-Qualified Stock Option, the par value per share of Stock; provided, however, that following the date that the exemption from

13

the application of Section 162(m) of the Code described in Section 16 (or any other exemption having similar effect) ceases to apply to Options, all Options intended to qualify as 'performance-based compensation' under Section 162(m) of the Code shall have an Option Price per share of Stock no less than the Fair Market Value of a share of Stock on the Date of Grant." Fair Market Value is defined by the Plan as "the closing price on the primary exchange with which the Stock is listed and traded on the date prior to such date."

34.    The Plan also states that the exercise price of options granted to 10% stockholders "shall be at least 110% of the Fair Market Value (on the Date of Grant) of the Stock subject to the Option."

35.    Pursuant to Accounting Principles Board Opinion 25 ("APB 25"), the applicable GAAP provision at the time of the foregoing stock option grants, if the market price on the date of grant exceeds the exercise price of the options, the company must recognize the difference as an expense.

36.    Pursuant to Section 162(m), compensation in excess of $1 million per year, including gains on stock options, paid to a corporation's five most highly-compensated officers is tax deductible only if: (i) the compensation is payable solely on account of the attainment of one or more performance goals; (ii) the performance goals are determined by a compensation committee comprised solely of two or more outside directors, (iii) the material terms under which the compensation is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before the payment of the compensation, and (iv) before any payment of such compensation, the compensation committee certifies that the performance goals and any other material terms were in fact satisfied.

37.    From 1999 to 2006, the Compensation Committee, which was responsible for

making recommendations concerning salaries and incentive compensation for executive officers and administering and granting stock options pursuant to the Plan, with the knowledge and approval of the other members of the Board, knowingly and deliberately violated the terms of the Plan, APB 25, and Section 162(m) by knowingly and deliberately backdating grants of stock options to make it appear as though the grants were made on dates when the market price of Jupitermedia stock was lower than the market price on the actual grant dates, thereby benefiting the recipients of the backdated options.

38.     The members of the Board who were not on the Compensation Committee had actual knowledge of the backdating and knew that it violated the terms of the Plan, ABP 25 and Section 162(m).  Meckler and Cardell, in particular, knew that the option grants awarded to them were not actually granted on the purported dates of grant.  All of the members of the Board knew that the publicly reported grant dates and statements that the Company followed APB 25 and granted options with exercise prices equal to the fair market value of Jupitermedia stock on the date of grant were false because the grants were in fact backdated.  The entire Board knowingly and deliberately approved the backdating scheme with knowledge of its consequences, e.g., its effects on Jupitermedia's financial statements.  Indeed, an analysis of stock options awarded to the Individual Defendants from 1999 until 2001 demonstrates that the Individual Defendants violated clear and unambiguous terms and conditions of the Plan by granting stock options with exercise prices that were not equal to the fair market value of Jupitermedia's common stock on the date of grant.

**Backdating of Stock Options Grants to the Option Recipient Defendants**

39.     Defendants Meckler, Cardell and Baudouin purportedly received stock option grants on June 25, 1999 and September 7, 1999, both of which coincided with Jupitermedia's

lowest closing prices of the entire year, as shown below:



| Date of Purported Grant | Name | Exercise Price | Number of Options |
|---|---|---|---|
| 06/25/99 | Meckler[3] | $15.40 | 200,000 |
| | Cardell | $14.00 | 50,000 |
| | Baudouin | $14.00 | 15,000 |
| 09/07/99 | Meckler | $14.75 | 100,000 |
| | Cardell | $13.41 | 25,000 |
| | Baudouin | $13.41 | 5,000 |

40.     Similarly the following year, Defendants Meckler, Cardell and Baudouin were granted stock options purportedly on April 17, 2000 and December 7, 2000, which also coincided with Jupitermedia's lowest closing prices of the entire year, as demonstrated below:

---

[3] The exercise prices of the stock options granted to Meckler from 1999 to 2000 were equal to 110% of the fair market value of the Company's stock on the purported date of grant because Meckler owned at least 10% of the Company's stock during that time period.



| Date of Purported Grant | Name | Exercise Price | Number of Options |
|---|---|---|---|
| 04/17/00 | Meckler | $14.85 | 300,000 |
| | Cardell | $13.50 | 75,000 |
| | Baudouin | $13.50 | 25,000 |
| 12/07/00 | Meckler | $7.05 | 200,000 |
| | Cardell | $6.41 | 110,000 |
| | Baudouin | $6.41 | 27,500 |

41.    Defendant Meckler, Cardell, Baudouin and Davies received stock option grants purportedly on May 24, 2001 when Jupitermedia's stock price had dropped significantly before May 24, 2001 and rose $1.06, or 36.3%, in the twenty trading days following the purported grant date, as demonstrated in the following chart:



| Date of Purported Grant | Name | Exercise Price | Number of Options |
|---|---|---|---|
| 05/24/01 | Meckler | $2.85 | 165,000 |
| | Cardell | $2.85 | 55,000 |
| | Baudouin | $2.85 | 13,750 |
| | Davies[4] | $2.85 | At least 1,000 |

42.    The stock options granted to defendants Meckler, Cardell and Baudouin purportedly on September 24, 2001 were dated at the absolute lowest closing price of the entire year, as demonstrated in the following chart:

---

[4] The May 24, 2001 grant to Davies did not appear in any proxy statements filed by the Company but was first disclosed in a Form 4 filed on November 22, 2004, which only included the number of options that were exercised and left unexercised on the transaction date, so the total number of options granted to Davies is unknown.



| Date of Purported Grant | Name | Exercise Price | Number of Options |
|---|---|---|---|
| 09/24/01 | Meckler | $0.97 | 205,000 |
| | Cardell | $0.97 | 68,750 |
| | Baudouin | $0.97 | 17,000 |

43.    Each and every one of the aforementioned stock option grants were dated just before a significant increase in Jupitermedia's stock price and/or near or at Jupitermedia's lowest closing stock price of the pertinent fiscal year.  Furthermore, 6 of the 7 stock grants made from 1999 to September 2001 that were disclosed in proxy statements and Form 4s were dated to coincide with historically low closing prices.

44.    The reason for the extraordinary pattern set forth in the preceding paragraphs is that the purported grant dates set forth therein were not the actual dates on which the stock option grants were made.  Rather, the Compensation Committee members, with knowledge and approval of the other members of the Board, knowingly and deliberately backdated the stock option grants to make it appear as though the grants were made on dates when the market price of Jupitermedia stock was lower than the market price on the actual grant dates.  This improper